The City of Monmouth, Petitioner, *v.* The Environmental Protection Agency *et al.,* Respondents.

(No. 72-86; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Third District—March 28, 1973.

*Rehearing denied April 24, 1973.*

Bufford W. Hottle, Jr., of Monmouth, and Kenneth R. Shorts, of Waukegan, both for appellant.

William J. Scott, Attorney General, of Springfield, (Prescott Bloom, Assistant Attorney General, of counsel,) for appellees.

Mr. JUSTICE STOUDER delivered the opinion of the court:

On this appeal the City of Monmouth seeks review of an order of the Pollution Control Board which order levied a fine against the City of Monmouth in the amount of $2,000 and required the City to cease and desist from other conduct relating to odors. This is a direct review of the Board's action as provided by the Environmental Protection Act (Sec. 1001, et seq., ch. 111½, Ill. Rev. Stat.), and comes to us pursuant to the Administrative Review Act. Ill. Rev. Stat., sec. 264, et seq., ch. 110.

The Pollution Control Board, pursuant to complaint instituted by the Environmental Protection Agency, found the City of Monmouth guilty of air pollution in conjunction with operation of a three-cell sewage lagoon system. The first cell was an anaerobic lagoon approximately 275 feet by 275 feet square and 15 feet deep. There were two other lagoons each of slightly less than 40 acres. These lagoons were constructed by the City of Monmouth pursuant to an agreement entered into between the City of Monmouth and Agar Packing Company on March 4, 1964. A construction permit was granted by the Sanitary Water Board of the State of Illinois on July 31, 1964 for construction of the sanitary lagoons and they were put into operation upon the completion of the construction of the packing plant facility.

All construction was done pursuant to the plans submitted to the Sanitary Water Board. After construction, the City became aware that an odor problem existed, consulted with the Sanitary Water Board regarding the operation of the lagoon and received a number of suggestions from the Sanitary Water Board regarding methods of eliminating the odor problem. The suggestions included recirculation facilities, the addi-

tion of paunch manure to create a grease cap or seal on the lagoon and the elimination of all possible blood waste from the lagoon.

The City of Monmouth installed first two and then two more pumps in an effort to aeriate the first stage of the lagoon by inducing more oxygen in the lagoon and further entered into a contract for the introduction of enzymes to combat the odor problem.

Numerous witnesses, mostly residents of the area, testified on behalf of the Agency that a strong smell like that of rotten eggs came from the area surrounding the first lagoon. It also appeared that the hydrogen sulfide fumes causing the strong smell also caused discloration of paint on houses situated in the general area.

The order of the Board found generally that there were noxious odors emitted from the lagoon system, the City of Monmouth as the operator of the lagoon, permitted the emission of such noxious odors and that therefore the Environmental Control Act was violated. The City was fined $2,000 and was ordered to cease and desist from permitting the emission of such noxious odors within six months from the date of the order.

On this appeal both the petitioner and respondent have devoted the major portions of their briefs to a discussion of the question of the constitutionality of certain provisions of the Environmental Control Act. In particular the petitioner has argued there has been an unconstitutional delegation of legislative and judicial powers to an administrative agency in violation of the separation of powers required by the Illinois constitution. Furthermore petitioner has argued the power of the administrative agency to assess a penalty deprives petitioner of property without due process of law.

■■ At the time the briefs were filed in this case the constitutional question raised by the parties had not then been passed upon by any Illinois court of review. Since then this court in *C. M. Ford v. Environmental Protection Agency*, 9 Ill.App.3d 711, 292 N.E.2d 540, has considered such issues and resolved them in favor of the constitutionality of the Act and the authority to assess a penalty. In this regard the briefs of the parties present no reasons for considering the question anew and accordingly on the authority of the *Ford* case we conclude that petitioner's constitutional argument is without merit.

Appellant also argues the action of the Board was invalid because no standards relating to air pollution had been promulgated by the Board as provided by Ill. Rev. Stat. 1970, ch. 111½, pars. 1009 & 1010. Additionally the City of Monmouth insists that the order of the Board is not supported by the evidence.

Section 1009 (a) provides:

"No person shall:

(a) Cause or threaten or allow the discharge or emission of any contaminant into the environment in any State so as to cause or tend to cause air pollution in Illinois, either alone or in combination with contaminants from other sources, or so as to violate regulations or standards adopted by the Board under this Act; * * *."

Section 1010 indicates but does not limit the areas in which the Board may prescribe standards and regulations respecting certain conduct and nature or sources of pollutants.

■■ It is conceded by the Board that no standards or regulations have been adopted establishing hydrogen sulfide levels or regulating the operation of open lagoon facilities such as the one involved in this case. However as the appellee points out, Section 1009 describe alternative violations and a violation may occur where contaminants tend to cause pollution (as defined in 1003 (b)) even though no standards have been proposed. Neither Section 1009(a) or 1010 mandate the establishment of specific standards in terms measurable by appropriate instrumentation but on the contrary the Board is permitted to do so. Where such standards are so established it might well be that the violation of the standard itself would be *prima facie* evidence of unreasonable air pollution. In this connection it should be observed that Section 1033(c) describes the criteria to be considered in determining the reasonableness of a contaminant such criteria being applicable to the orders and determinations of the Board described in Sections 1033(a) and 1033(b) of the Act. When these Sections are considered together namely, 1003(b), 1009(a) and 1033(a) (b) and (c), we believe that sufficient standards are described delineating both the proscribed conduct and the scope of the Board's authority in administration of the Act.

This brings us to the question of whether the evidence supports the findings of the Board and whether its findings support its order. These questions are related as we shall see and it is our conclusion that the order of the Board is erroneous on both counts.

The statute (Ill. Rev. Stat. 1970, ch. 111½, par. 1033(c)), provides,

"(c) In making its orders and determinations, the Board shall take into consideration all the facts and circumstances bearing upon the reasonableness of the emissions, discharges or deposits involved including, but not limited to:

(1) the character and degree of injury to, or interference with the protection of the health, general welfare and physical property of the people;

(2) the social and economic value of the pollution source;

    (3) the suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved; and

    (4) the technical practicability and economic reasonableness of reducing or eliminating the emissions, discharges or deposits resulting from such pollution source."

So far as the evidence is concerned, the Agency presented the testimony of a number of witnesses supporting its position that hydrogen sulfide gas was emitted from the first cell of the lagoon system and that the same substantially affected people and property in the area. However from the criteria established in 1033(c) it appears that the reasonableness of the emission depends not merely on the establishment of some injury to person or property as specified in 1033(c) (1) but the degree and significance of such conduct must be related to the other factors specified in 1033(c) where issues have been raised regarding such other factors. Of particular concern to us is the failure of the Agency to provide any evidence regarding technological practicability as required by 1033(c) (4) even though this was an issue before the Board and even though the Board made a finding with regard thereto such finding being wholly outside the record and unsupported by any evidence. There was some evidence presented by the appellant regarding the possibility of alleviating the problem by covering the lagoon with a plastic cover, collecting the gas and then incinerating the same. The reasonableness of such a proposal does not appear to have been considered to any significant degree by the Board and as revealed by its findings the Board's conclusions can be at best regarded as inconsistent.

In its finding regarding technical problems the Board observed,

    "In a variance request by Texaco, Inc. in Salem, Illinois we considered a situation in which 3,000 pounds per day of $H_2S$ was being emitted into the atmosphere. Control down to 6.5 pounds per day was effected by a system which oxidized the $H_2S$ to elemental sulfur by exposure to dissolved air in the presence of a nickel chloride catalyst."

■■ The above finding was wholly unsupported by any evidence presented and indeed there is no claim made that it is inferable from the evidence. It seems elementary that the Board's decision must be based on the evidence before it and not on the evidence presented in some other case. This practice was condemned in *North Shore Sanitary Dist. v. Pollution Control Board*, 2 Ill.App.3d 797, 277 N.E.2d 754, and what was said in that case is equally applicable to this case.

Not only is the finding not based on any evidence in the case but it is also apparent that the procedures which may have been involved with

the Texaco Company are substantially dissimilar from the problem presented in this case and hence we conclude the Board's reliance on such fact does not support its order. Where the $H_2S$ originated so far as the Texaco Company is concerned is not indicated but reduction of $H_2S$ to elemental sulphur does not involve an analogous process. That such process was irrelevant to the order of the Board even though it seems to have been the basis of its technological considerations, is demonstrated by the further finding of the Board when it stated,

> "In controlling the $H_2S$ odor problem in this case by incineration Monmouth must consider if they are creating an objectionable $SO_2$ problem. From the state of the record we cannot ascertain the precise volume of $H_2S$ generated per day. In any event, it seems safe to assume that the quantity will not be so large as to preclude the consideration of incineration to control the odor nuisance. Beyond that, on the instant facts it would appear to be an attractive trade-off if Monmouth can substitute an $SO_2$ problem for the present $H_2S$ problem. We should add for the benefit of future parties before the Board that apart from the testimony of the strength and character of the odor as perceived by the senses it would not only be helpful but necessary in some cases to have an estimate of the quantity of the pollutant which is generated on the record."

In other words the proposal to incinerate the gas collected under the plastic cover intended only a conversion to $SO_2$ or sulfur dioxide, a substantially more noxious product then elemental sulfur. Indeed this finding not only fails to indicate the reasonable feasibility of the proposed change but in no uncertain terms reveals that the Board has been presented insufficient evidence to support any conclusions on the technological practicability of what it considers to be the basis of its order.

■■■ From the foregoing it is our conclusion that there are material findings of the Board unsupported by evidence and that the findings themselves demonstrate vagueness, inconsistencies and ambiguities insufficient to justify the resolution of the problem embodied by the Board in its order.

For the foregoing reasons the order of the Pollution Control Board is vacated and the cause is remanded to such Board for further proceedings.

Judgment vacated and remanded.

ALLOY, P. J., and DIXON, J., concur.